Minute Order Form (06/98)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4807 | **DATE** | 2/23/2004 |
| **CASE TITLE** | Giovanni Ballatore vs. Fairmont Hotels & Resorts, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3/8/2004 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 19-1) is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 25 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/23/2004 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GIOVANNI BALLATORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 4807 |
| | ) | |
| FAIRMONT HOTELS & RESORTS, INC., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Giovanni Ballatore charges Defendant Fairmont Hotels & Resorts, Inc. ("Fairmont" or "the Hotel"), with discriminating against him on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., by reducing the number of his scheduled shifts. When he filed a charge to protest this treatment, Ballatore alleges, Fairmont retaliated by harassing him, resulting in a constructive discharge. Fairmont moves for summary judgment. For the following reasons, the motion is granted in part and denied in part.

## FACTS

Plaintiff Ballatore, born in 1936, was employed by Fairmont as an "on-call" banquet server beginning in 1992. (Defendant's Rule 56.1(a)(3) Statement of Material Facts as to Which There is No Genuine Issue (hereinafter, "Def.'s 56.1") ¶¶ 11, 13.) As a banquet server, Ballatore's responsibilities included serving guests at the Hotel's banquet functions and setting up and cleaning up for such functions. (Id. ¶ 9.) In 2001, Ballatore was one of twelve on-call servers who had earned a spot on the Hotel's "Loyalty List," a list of servers called first when needed to supplement the Hotel's staff of 19 full-time banquet servers. (Id. ¶¶ 7, 12.) Ballatore was the oldest of the twelve; four others were within five years of his age, and the remaining seven were more than twelve years younger than he was. (Id. ¶ 13.)

On September 4, 2001, Till Grob, born in 1969, was hired by the Hotel as Director of Banquet Operations. (Id. ¶ 4; Plaintiff's Additional Statement of Material Facts (hereinafter, "Pltf.'s 56.1") ¶ 3.) As Director of Banquet Operations, Till supervised two banquet managers, William Walker, born in 1966, and Anthony Myers, born in 1962. (Pltf.'s 56.1 ¶ 4.) Beginning in October 2001, Grob assumed the primary responsibility for scheduling on-call servers. (Def.'s 56.1 ¶ 15.) Initially, Grob was not aware of the "Loyalty List," but after he became aware of it sometime in late October, he "made every effort" to schedule servers from that list if full-time servers were not available. (Id. ¶¶ 17-19.)

Grob testified that within a week after his employment began, he received a written complaint from a customer concerning Ballatore's behavior. (Id. ¶ 34.) Grob does not recall the specific contents of the letter, however; he did not discuss the matter with Ballatore or with anyone else at the Hotel, and he did not retain a copy of it. (Grob's Statement, Exhibit 13 to Plaintiff's Response to Defendant's Rule 56.1(1)(3) Statement (hereinafter "Pltf.'s 56.1 Response"); Grob Dep., Exhibit 1 to Pltf.'s 56.1 Response, at 11-12, 15.)[1] Soon after the time that Grob claims to have received this letter, in mid-September 2001, Jose Salazar, a full-time banquet server, called Ballatore directly to ask him to cover a function for Salazar later that day. Ballatore agreed. (Def.'s 56.1 ¶ 71.) Salazar then met with Grob and banquet manager Myers to advise them of the substitution. (Id. ¶ 72.) Grob, who was not yet familiar with many of the servers, asked Salazar who Ballatore was by saying, "That's the old man?" (Id. ¶¶ 73, 75; Salazar Dep., Exhibit G to Def.'s 56.1, at 15.) Salazar recalls that when he learned who Ballatore was, Grob responded by saying, "That old man, I don't want him working for me," and "I don't want no extra union people here."

---

[1]  Ballatore contends that there is no written reference to this alleged complaint prior to December 2001, when Grob mentioned it in a written response to Ballatore's complaint of age discrimination. In fact, however, the court notes that in an e-mail message Grob sent on October 30, 2001, he referred to "a customer complaint a few weeks ago" involving Ballatore. (E-mail print out, Exhibit 13 to Pltf.'s 56.1 Response.)

2

(Salazar Dep., at 16, 19.) Although Grob would have preferred that another regular full-time server substitute for Salazar, Ballatore claims that Grob ultimately accepted Myers' suggestion that Olga Molina, like Ballatore an on-call union worker, replace Salazar. (Pltf.'s 56.1 Response ¶¶ 77, 79, 82, 84; Pltf.'s 56.1 ¶¶ 9-11.)[2]

In the fall of 2001, Grob asked Anthony Myers, who had been employed as a banquet manager for Fairmont for some time before Grob's arrival, to rank the performance of the Hotel's top 15 on-call servers. Myers did not include Ballatore in this list because, in Myers' view, Ballatore was sloppy and rude; Myers recalled one incident (undated in the record) when a guest asked Ballatore for a different salad dressing and Ballatore responded that "it was either this or nothing." (Def.'s 56.1 ¶¶ 35-36; Myers Aff., Exhibit P to Def.'s 56.1.) Ballatore points out that he was not notified of any performance deficiencies, nor was he disciplined for any such matters prior to July 2002. (Pltf.'s 56.1 Response ¶¶ 35, 36.) Banquet manager William Walker testified that Ballatore behaved disrespectfully and made "snide remarks" during pre-shift meetings. (Walker Dep., Exhibit F to Def.'s 56.1, at 27-28.) Ballatore admits that he was "sometimes outspoken" during such meetings and does not deny that Walker verbally counseled him about this behavior; he emphasizes, however, that it did not result in any formal discipline. (Pltf.'s 56.1 Response ¶ 37.) Walker believed Ballatore's "work ethic and job performance" were below standards and preferred not scheduling him, but when he raised the matter with Grob, Grob pointed out that Ballatore's name was on the Loyalty List and directed Walker to call him. (Walker Dep., at 24-25.) Grob admits that he did not schedule Ballatore for a period of time in October, citing the customer

---

[2] Defendant claims the evidence does not support Plaintiff's contention that Molina substituted for Salazar for a September 12, 2001 event. Plaintiff contends the records show that Molina did substitute for full-time servers on three occasions in September, including September 16. Neither party has offered those records in evidence, and as Defendant bears the burden of showing there are no disputes, the court will draw inferences in favor of Plaintiff on this issue. The court suspects that any event scheduled for September 12, 2001, the day after the terrorist attacks, likely was cancelled or postponed.

3

complaint he had received earlier. (Grob Dep., Exhibit D to Def.'s 56.1, at 20-21.) After the union brought the Loyalty List to his attention, however, Grob asserts that he has adhered to that list and that "[o]n days when other union extras whose names are not on the list worked and Mr. Ballatore was not scheduled I was either unable to reach Mr. Ballatore, he did not call in to inquire about shifts as is the current procedure with all union extras or he was already scheduled to work at another property when I contacted him." (Grob Statement, Exhibit 13 to Pltf.'s 56.1 Response.)

Although the collective bargaining agreement between Fairmont and its servers requires that seniority should be honored, Plaintiff admits that the Hotel does not in fact schedule Loyalty List servers in order of seniority. (Collective Bargaining Agreement, Exhibit 8 to Pltf.'s 56.1 ¶ 25(e); Def.'s 56.1 ¶ 20; Pltf.'s 56.1 ¶¶ 25, 26.) Instead, Grob considered the servers' performance history, their availability, and their disciplinary records in making scheduling decisions. (Def.'s 56.1 ¶ 21.) Grob testified that performance involves completing work assignments, showing up on time, and doing the job as assigned. (Pltf.'s 56.1 ¶ 20.) Grob did not recall any tardiness issues with Ballatore; did not recall whether Ballatore declined any job assignments in late 2001; and acknowledged that Ballatore received no formal discipline in 2001. (Grob Dep., Exhibit D to Def.'s 56.1, at 23-25.) He nevertheless scheduled Olga Molina (born 1957), Donaciano Sota (born 1955), and Litzia Lino (born 1957) more often than Plaintiff and other servers on the Loyalty List. (Def.'s 56.1 ¶¶ 13, 22.)[3]

Plaintiff admits that from September 2001 through September 2002, Molina received no disciplinary warnings; Soto was disciplined on a single occasion for failing to return his uniform at

---

[3] In contrast, banquet manager William Walker, who scheduled servers approximately ten percent of the time from September through December 2001, simply called Loyalty List servers in order as their names appeared on the list. Walker testified that the list was not alphabetical, but he was not certain whether the list was organized by seniority or by any other principle. Ballatore was number four or five on the list. (Def.'s 56.1 ¶¶ 16, 23; Walker Dep., Exhibit 3 to Pltf.'s 56.1, at 23-26.) Ballatore asserts that there were several functions in October, November, and December for which the Hotel used more than five on-call servers, but he was not called. (Plt.'s 56.1 Response ¶ 23 .)

4

the conclusion of his shift; and Lino was disciplined once for arriving late to work for two of her shifts. (*Id.* ¶¶ 24-26.) Plaintiff admits, further, that the events of September 11, 2001, resulted in a reduction in the number of Hotel banquets in Chicago in late 2001. (*Id.* ¶ 27.) He nevertheless worked at 11 functions in September 2001, more than nine other servers on the Loyalty List, including Litzia Lino and five other younger on-call servers. (*Id.* ¶¶ 13, 28-29.) In the last three months of 2001, after Grob became involved in scheduling, Ballatore was assigned to work at only 12 more functions, for a total of 23. Of the 12 other servers on the Loyalty List, three (Molina, Soto, and Juan Azpeitia, born 1952) had greater totals for the last four months of 2001, and four (Molina, Soto, Azpeitia, and Lino) were assigned more frequently than Ballatore in the last three months. (Pltf.'s 56.1 Response ¶ 31; Pltf.'s 56.1 ¶¶ 16-19.)[4]

Ballatore filed a charge of age discrimination against the Fairmont on November 26, 2001. He contends that after he filed his charge, he received a greater number of banquet work assignments in December 2001. (Pltf.'s 56.1 ¶ 32.) From January through September 2002, moreover, Molina, Soto, and Lino were the only on-call servers on the Loyalty List who earned more than Ballatore did. (*Id.* ¶ 13.)

Beginning in February 2002, Grob started to issue formal discipline to Ballatore. On February 16, 2002, Grob gave Ballatore a verbal warning for taking an unauthorized break – specifically, after delivering a linen cart to the Hotel's laundry room, Ballatore took an unscheduled cigarette break in the Hotel's designated smoking room. (Pltf.'s 56.1 Response ¶¶ 39-40.) Also

---

[4] Defendant objects to Plaintiff's effort to provide factual detail concerning server assignments through the affidavit of his attorney. Defendant notes, correctly, that Plaintiff has not attached copies of the server assignment records as exhibits to that affidavit. (Defendant's Responses to Plaintiff's additional Local Rule 56.1 Statement of Facts, at 1-2.) Notably, however, Defendant does not contest the accuracy of the data presented in that affidavit, and the court accepts it for purposes of this motion. Defendant's own assertion that Ballatore worked 67 functions during the last four months of 2001 (Def.'s 56.1 ¶ 32) is clearly inaccurate; the testimony Defendant cites refers to the first eight months of 2002. (Ballatore Dep., Ex. C to Def.'s 56.1, at 64.)

on February 16, 2002, Grob issued Ballatore a verbal warning for an incident a week earlier, when Ballatore admittedly took a smoking break in a supply closet just off the International Ballroom, where smoking is prohibited by Hotel policy. (Def.'s 56.1 ¶¶ 42-43.) On July 20, 2002, Walker issued Ballatore a final warning after two guests informed Walker that Ballatore had placed a plate on top of one guest's hands, had banged into another guest and into their chairs, and had been rude and pushy. (Id. ¶¶ 45-46.) Ballatore denies he engaged in such conduct, but does not deny that the complaints were made. (Pltf.'s 56.1 Response ¶¶ 45-46.) Nine days later, on July 29, 2002, Walker notified Sean Billing, the Hotel's human resources manager, that Ballatore had left his scheduled function early without completing his work or receiving permission to leave. (Id. ¶ 50.) On July 31, 2002, Walker issued Ballatore another verbal warning when Ballatore, along with four other servers, failed to return his tie and vest at the end of his shift, as required by Hotel policy. (Id. ¶ 48.)

On August 1, 2002, Sean Billing met with Ballatore to discuss the Hotel's performance expectations. (Id. ¶ 51.) Billing reviewed Ballatore's recent discipline with him and reminded him that he needed to have a manager's permission to take a break or leave a work assignment. (Id. ¶ 52.) In a letter dated August 2, 2002, Billing confirmed the discussion and warned Ballatore that his performance must improve. (Id. ¶ 53.) Another incident nevertheless occurred just a few weeks later on September 20, 2002. At 9:30 that evening, near the end of a dinner, Ballatore asked banquet manager Myers for permission to take a cigarette break. As a few guests (according to Ballatore, about a dozen) still remained in the dining room, Myers refused. (Id. ¶¶ 54-56; Pltf.'s 56.1 ¶ 33.) Ballatore, who believed his request was "not unreasonable given the circumstances" (Pltf.'s 56.1 Response ¶ 54), told Myers he was going on a break despite Myers' refusal. (Def.'s 56.1 ¶ 57.) Myers conferred with Walker about Ballatore's conduct, and both managers agreed that Ballatore should be sent home. (Id. ¶ 59.) Walker took Ballatore's tie and

vest and told him not to report for his previously scheduled shifts on September 21 and 22. (*Id.* ¶ 60.)

Neither Walker nor Myers had the authority to terminate Ballatore; instead, Walker described the incident in an e-mail message to Billing and Grob, and told Ballatore to call the Hotel's human resources department the following Monday. (*Id.* ¶¶ 61, 62.) A few days later, Grob telephoned Ballatore to schedule him for another function, but Ballatore responded by saying, "I can not perform my duty..... They just picking on me too much, upset me. I just can not do it." (*Id.* ¶ 63; Ballatore Dep., Exhibit C to Def.'s 56.1, at 38-39.) Grob asked Ballatore to put his resignation in a letter to Sean Billing. (*Id.* ¶ 64.)

Following his conversation with Ballatore, Grob advised Billing that Ballatore had resigned. (*Id.* ¶ 65.) In a letter to Ballatore dated October 18, 2002, Billing stated:

> [Till Grob] informed me that in a telephone conversation of September 24, 2002 you indicated to him that you would no longer be performing the duties of an on-call waiter at the Fairmont Hotel. He also told me that he had asked you to formally resign in writing and/or call me directly to indicate your intentions.

(Billing Letter, Exhibit 8 to Tab H to Def.'s 56.1.) Billing's letter included his phone number and concluded by warning Ballatore that if he did not communicate with the Hotel by October 25, "we shall consider that you have resigned. . . . " (*Id.*; Def.'s 56.1 ¶¶ 66, 67.) When he received Billing's letter, Ballatore called Billing and told him he was unhappy about being denied a break on his last day of work and could no longer perform his duties for the Fairmont. (Def.'s 56.1 ¶ 68; Ballatore Dep., Exhibit C to Def.'s 56.1, at 45.) Ballatore confirmed that he had resigned because, in his words, "that place [the Hotel] is all fucked up." He specifically referred to the September 20, 2002 incident, and observed, "for cigarettes they are going to fucking put me on the cross." (Def.'s 56.1 ¶ 69.) Billing accepted Ballatore's resignation. (*Id.* ¶ 70.)

7

Following his resignation from the Fairmont, Ballatore sought work as a banquet server at several other local hotels. After two months without success, Ballatore "just [gave] up" trying to find work.

## DISCUSSION

### A. Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000).

Plaintiff Ballatore claims that he was subject to different terms and conditions of employment on the basis of his age and that he was harassed and constructively discharged in retaliation for his complaints of discrimination. The court addresses each argument in turn.

### B. Age Discrimination

A plaintiff may prove employment discrimination under the Age Discrimination in Employment Act using either the "direct method" or the "indirect method." The direct method requires direct or circumstantial evidence that the employer's decision to take an adverse job action against him was motivated by his age. Our Court of Appeals has characterized direct evidence as "essentially . . . an admission by the decision-maker that his actions were based on" age. *Cerutti v.*

*BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003) (citing *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)). A plaintiff may also prevail under the direct method by "constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Id.* at 1061 (quoting *Rogers*, 320 F. 3d at 753 and citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Circumstantial evidence must, however, "point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Absent evidence that would support a finding of discrimination under the direct method, a plaintiff may proceed under the indirect, burden-shifting method, offering evidence that, absent explanation, supports an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). A plaintiff must first establish a prima facie case of discrimination by demonstrating that (1) he is a member of the protected class (in an ADEA case, employees over 40 years of age, *see* 29 U.S.C. § 631(a)); (2) he was performing at a satisfactory level; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than younger, similarly situated employees. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 574 (7th Cir. 2003). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant offers such a reason, the plaintiff bears the burden of showing that it is a pretext for unlawful discrimination. *Id.*; *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002).

Ballatore contends that he has evidence sufficient to defeat summary judgment under either of these methods. He notes, first, the evidence that on one occasion in September 2001, Grob refused the request of a full-time server to have Ballatore substitute for him, referring to Ballatore as "that old man." Grob was admittedly new to his position, and Defendant argues that Grob used this expression merely as a way of describing or identifying Ballatore within the workforce.

9

Defendant contends, further, that Grob's objection to assigning Ballatore as substitute server was based on a letter Grob had received complaining about Ballatore's rude behavior. Finally, Defendant challenges the evidence Ballatore relies on for his claim that it was a younger worker, Olga Molina, who ultimately filled in for the absent full-time worker.

As noted, in reviewing Defendant's motion for summary judgment, the court is required to construe all facts and inferences in the light most favorable to Plaintiff, drawing all reasonable inferences in his favor. *Haugerud v. Amery School Dist.*, 259 F.3d 678, 689 (7th Cir. 2001). Although Grob may well have used the expression "old man" merely as a way of identifying Ballatore, Salazar testified in addition that Grob said, "That old man, I don't want him working for me." If a jury were to believe Salazar's testimony, it could infer that on this single occasion, Grob declined to permit Ballatore to substitute for a full-time server on the basis of Ballatore's age. Ballatore had no claim of right to the assignment, and he has not argued that the loss of pay for this single assignment, standing alone, is actionable. Instead, Ballatore relies on the September 2001 incident as evidence that the reduced number of work assignments he received over the next three months was a product of age discrimination. Grob admittedly preferred scheduling three younger workers over Ballatore but claims that those three servers had better performance records. In addition, Grob sought out input on the scheduling issue from banquet manager Anthony Myers, who had been with Fairmont longer than Grob. Ballatore was one of the 12 Loyalty List servers entitled to be called first when additional banquet servers were needed, but Myers did not rank Ballatore within the best 15 on-call servers and observed that Ballatore was sloppy and rude. William Walker, the other banquet manager, believed that Ballatore was disrespectful and preferred not scheduling him.

It was Grob, not Walker or Myers, who made most of the scheduling decisions after September 2001, and there is some evidence that Ballatore was treated unfavorably during that time frame. Grob acknowledged that, based on the customer complaint he claims to have received

10

in September, he chose not to schedule Ballatore for one or more events in October. After he learned about the Loyalty List, however, Grob asserts that he did adhere to policy and call workers from that list. Defendant notes, for example, that Grob directed Walker to schedule Ballatore despite Wacker's reservations about Ballatore's demeanor. Ballatore points out, however, that from October through December 2001, he worked at only 12 events, a number he contends demonstrates a decline in the percentage of assignments greater than that suffered by nearly all of the younger servers. His income declined as well, from a high of $29,000 in 2000 to a total of only $12,000 through September 2002, a percentage decline greater than that suffered by all but one of the other Loyalty List servers. (Loyalty List Earnings, Exhibit 11 to Pltf.'s 56.1 Response.) To the extent Defendant has suggested that poor performance was the reason for this decline, Ballatore notes he received no complaints from guests and was never disciplined or even counseled about any service-related matters until July 2002.

The evidence that Ballatore was treated less favorably than others is not overwhelming. As noted, only three on-call servers had more assignments in the last four months of 2001 than Ballatore did, and only four had more assignments in the last three months of that year. Ballatore himself contends that he was assigned to work *more* frequently in December 2001. In addition, for the first nine months of 2002, Ballatore earned more than all but three servers on the Loyalty List. There was some evidence in William Walker's testimony that Ballatore was ranked "fourth or fifth" on the list of on-call servers; if true, Ballatore provides no basis for the court to conclude he was scheduled less frequently than fairness would dictate.

Nevertheless, Grob testified that he declined to schedule Ballatore due to a customer complaint that he neither retained nor discussed with Ballatore. He also acknowledged that he preferred scheduling three younger workers on the Loyalty List. Finally, there is disputed testimony from which a jury could infer that Grob did not want "that old man" working for him. Although Ballatore's poor performance may well have been a factor in this decision, there is evidence that

11

would support a finding that age discrimination was a factor, as well. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148 (2003) (holding that direct evidence of discrimination is not required in order to prove employment discrimination in mixed-motive cases). The court concludes that Plaintiff's claim that age discrimination affected the terms and conditions of his employment survives summary judgment.

In reaching this conclusion, the court cautions that any damages Ballatore suffered are likely to be very modest. If his poor performance was a valid reason for the decline in the number of banquets to which he was assigned, he may be entitled to no lost pay damages at all. Even if age discrimination alone was involved here, Ballatore may have difficulty establishing that the number of banquets to which he was assigned is measurably lower than the number he could fairly have expected absent discrimination. Finally, for the reasons explained below, the court concludes that Ballatore was not constructively discharged and therefore will collect no damages as a result of the loss of his position.

## C.  Retaliation

On November 26, 2001, Ballatore filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). This lawsuit, filed in July of 2002, followed. Ballatore contends that he was harassed and subjected to unfair discipline in retaliation for his charge of discrimination and his subsequent lawsuit. A plaintiff claiming retaliation can defeat summary judgment in one of two ways: (1) by providing direct evidence of the employer's intent to retaliate, or (2) by establishing a prima facie case of retaliation under the *McDonnell Douglas* burden-shifting approach. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Ballatore offers no direct evidence of the Fairmont's intent to retaliate against him. Accordingly, he must establish a prima facie case of retaliation by demonstrating that (1) he engaged in statutorily protected activity; (2) he met his employer's expectations; (3) he suffered an

12

adverse employment action; and (4) he was treated less favorably than other similarly-situated employees who did not engage in such protected activity. *Stone*, 281 F.3d at 644.

It is undisputed that Ballatore engaged in protected activity when he filed his charge of discrimination and this lawsuit. The remaining aspects of his case are disputed. Defendant contends that Ballatore was not meeting his employer's legitimate expectations and that he did not suffer any adverse employment action. The court agrees that the evidence is insufficient to support these elements of Ballatore's case.

First, the evidence of any adverse employment action is scanty. Ballatore does not suggest that he was assigned to fewer shifts because of his EEOC charge; to the contrary, he notes with suspicion that he received a greater number of assignments in December, the month after he filed is charge. An adverse action is essential for both claims of discrimination and retaliation, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 899-902 (7th Cir. 2003), though in retaliation cases the court may define the term more generously. Ballatore claims his supervisors harassed him, but the evidence shows only that on occasions in February, July, and September 2002, when Ballatore admittedly violated work rules, his supervisors imposed verbal counseling or discipline. Such minor sanctions do not represent a "significantly negative alteration" in Plaintiff's workplace environment, even for purposes of a retaliation claim. *See Johnson*, 325 F.3d at 902 (neither the employer's enforcement of workplace rules nor write-ups of the plaintiff for performance problems was sufficient adverse action for purposes of a retaliation claim). *See also Griffin v. Potter*, No. 03-1342, ___ F.3d ___, 2004 WL 193578 (7th Cir. Feb. 3, 2004) (neither change of shift, lengthened commute, unfair discipline, unfavorable evaluation, difficult assignments, refusal to approve annual leave request, nor denial of parking permit constitutes adverse action for purposes of a retaliation claim); *Volovsek v. Wisconsin Dep't of Agr., Trade and Consumer Protection*, 344 F.3d 680 (7th Cir. 2003) (negative performance reviews, inadequate training, denial of support, and requirement that plaintiff undergo a math test were not actionable even for purposes of a retaliation claim).

13

Ballatore claims that he was subject to constructive discharge, which clearly does constitute adverse action. The circumstances make it clear, however, that Ballatore's resignation cannot fairly be characterized as a constructive discharge, which occurs either where an employer renders the employee's working conditions intolerable, *Hermreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002), or simply makes clear to the employee that he would be fired if he did not quit. *E.E.O.C. v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002) (collecting cases).

Constructive discharge may be the result of harassment – mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee. *Hermreiter*, 315 F.3d at 745. In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors are relevant, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hill-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)); *Hostetler*, 218 F.3d at 806. As the Seventh Circuit explained in *E.E.O.C. v. University of Chicago Hospitals*, where a plaintiff is relying on evidence of harassment to establish that he was constructively discharged, he must present evidence even more egregious than the high standard for a showing of a hostile environment. 276 F.3d at 331-32.

The "harassment" Plaintiff complains of in this case consists of little more than enforcement of reasonable workplace rules: that servers complete their shifts, take no breaks unless authorized by a manager, and refrain from smoking in the no-smoking areas of the Hotel. Ballatore did not deny the misconduct which resulted in discipline, nor has he offered any evidence that other servers guilty of similar misconduct were given "a pass." There was, in short, nothing discriminatory about the discipline imposed here; Ballatore's supervisors engaged in no physically

14

threatening or humiliating conduct; nor did they interfere with his work performance. If there is any "offensive utterance" in the record, perhaps it was Ballatore's own suggestion that the discipline imposed on taking an unauthorized smoking break was akin to crucifixion.[5]

There is also insufficient basis here for Ballatore's suspicion that Fairmont managers communicated that he would be fired if he did not quit. Ballatore rightly recognizes that the direction from Walker and Myers that Ballatore not come in for two scheduled shifts constituted a two-day suspension. (Pltf.'s 56.1 Response ¶ 60.) Neither Walker nor Myers had the authority to discharge Ballatore, however (*id.* ¶ 61), and Grob, who did have that authority, did not do so. Nor did Grob tell Ballatore to quit; to the contrary, Ballatore admits that a few days after the September 20, 2002 incident, Grob called to schedule him for further functions. (*Id.* ¶ 63.) It was Ballatore, not Grob, who announced that he could no longer work for the Fairmont. (*Id.*)

Sean Billing followed up a month later, inviting Ballatore to communicate with him and warning that his silence would be construed as a resignation. (*Id.* ¶¶ 66, 67.) Ballatore called Billing in response to this letter and told him, as he had told Grob, that he could no longer work for the Fairmont. (*Id.* ¶ 68.) In his response to Defendant's motion for summary judgment, Plaintiff explains that his decision rested on the facts "that I was being constantly written up for things, that my income had declined greatly, and that I knew that Grob didn't want me to work for him because I was an 'old man' . . . ." (*Id.*) As discussed above, however, as a matter of law, the "write-ups" of which Plaintiff complains are not harassment. To the extent that Plaintiff's income had declined

---

[5] Defendant has presented evidence of its workplace harassment policy, which prohibits harassment based on age and directs employees to report such conduct to the Hotel's human resources director. Because Plaintiff failed to report the harassment of which he now complains, Defendant contends, the Hotel is entitled to summary judgment on this claim. See *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). The conduct at issue here was that of Plaintiff's supervisors rather than his co-workers, so the argument based on *Parkins* may have less weight here; as the conduct does not amount to actionable harassment, the court need not address this issue.

15

and that he believed Grob did not want to employ him, Ballatore offers no explanation for his decision to decline Grob's invitation that he come back to work.

In short, even when viewed in the light most favorable to Plaintiff, there are no disputes concerning his claims of harassment or constructive discharge. Because the conduct at issue here did not constitute harassment, Plaintiff cannot meet the higher burden of establishing that the harassment rendered his continued employment intolerable. Finally, there is no basis for any inference that Defendant's managers advised Plaintiff to quit. The court therefore grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

Disputes of material fact preclude summary judgment on Plaintiff's claim that he was subjected to discriminatory terms and conditions of employment on the basis of his age. There are no disputes concerning Plaintiff's claim of retaliation, however, and that claim is dismissed. Plaintiff's damages, if any, are limited to amounts he would have earned for additional banquet assignments, if he can show he would have received such additional assignments absent age discrimination. Defendant's motion for summary judgment (Doc. No. 19-1) is granted in part and denied in part.

ENTER:

Dated: February 23, 2004

REBECCA R. PALLMEYER
United States District Judge